IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

PAM DOE, as natural mother and next of friend for minor JANE DOE 1, and JANE DOE 2, on behalf of themselves and all others similarly situated,

        Plaintiffs,

vs.

UNIFIED SCHOOL DISTRICT 259,

        Defendant.

Case No. 05-1151-JTM

MEMORANDUM AND ORDER

Plaintiffs filed the present action requesting class certification. Plaintiffs allege that Unified School District 259 (hereinafter "USD 259") violated Title IX and 42 U.S.C. § 1983. After reviewing the fully briefed motion and hearing oral argument, the court denies plaintiffs' motion for class certification.

Plaintiffs' complaints originated when the students attended a private, back-to-school party off school grounds in August 2004. At the party, an altercation occurred between the students and one male student (hereinafter "S.S.")[1]. On the following Monday after the party, the plaintiffs obtained a state court Protection From Stalking Order against S.S. Additionally, plaintiffs contacted South High School Assistant Principal Jennifer Sinclair. At the meeting, the

---

[1] All students are referred to by their initials except for the Doe students in an effort to protect their privacy. Defendant's Response to Plaintiffs' Motion for Class Certification (Dkt. No. 71), pg. 4.

plaintiffs told Ms. Sinclair about S.S.'s actions at the party and S.S.'s actions from the preceding school year. Plaintiffs had not complained about S.S. to Ms. Sinclair during the prior school year, but they do claim that they complained of S.S.'s behavior to Assistant Principal Terry Laudermilk and chemistry teacher Kelly Owens during the 2003-2004 school year. Mr. Laudermilk and Ms. Owens deny receiving any complaint of sexual harassment from the plaintiffs.

Plaintiffs seek to certify the following class: "(1) All females, formerly, currently or who in the future may be a student at any school within USD 259 since January 1, 1997." Memorandum in Support of Plaintiffs' Motion for Class Certification (Dkt. No. 63), pg. 37.

*I. Factual Background:*

*A. USD 259:*

USD 259, the largest school district in the state of Kansas, utilizes one hundred learning centers/schools for the education of 48,865 students in the city of Wichita. USD 259 is comprised of eleven high schools: East, Heights, Metro-Boulevard, Metro Meridian, Metro Midtown, North, Northeast Magnet, Northwest, South, Southeast, and West.

The USD 259 Board of Education (hereinafter "BOE") adopted a policy entitled "Sexual Harassment of Pupils," which states:

> USD 259 will not tolerate sexual harassment of any pupil by another pupil, employee or others. Violation of this policy shall result in disciplinary action against any pupil or employee involved, including possible expulsion of the pupil and termination of the employee. Others who violate this policy shall be reported to local law enforcement authorities for appropriate action and may be prohibited from being on school property and/or attending school activities. Administrators who fail to follow the policy or fail to investigate complaints shall also be disciplined.

Defendant's Response to Plaintiffs' Motion for Class Certification (Dkt. No. 71), pg. 6.  The policy extends "to protect the pupil while the pupil was engaged in any school activity under the control or operation of USD 259." *Id*. at 9.  The Deputy Superintendent has administrative responsibility for the policy.  At the time plaintiffs complained to USD 259, Mark Evans was the Deputy Superintendent.  Mr. Evans held this position until July 1, 2005.

USD 259 also provides yearly sexual harassment training for its employees, and it gives middle school and high school students a brochure entitled "*Harassment – What Secondary Students Should Know: A Simple Easy to Understand Explanation of Harassment and Its Effects on Students*" (hereinafter "Brochure").  The Brochure defines harassment as:

> . . . verbal or physical behavior that puts another person down or shows hostility towards another group or group of persons based on their race, color, religion, gender, national origin, age or disability. Harassment is: Creating an intimidating, hostile or offensive school environment. Unreasonably interferes with an individual's school performance.  Affects an individual's educational opportunities.

*Id.* at 11.  The Brochure also instructs students to "Keep written records of the incidents . . . Save any notes or pictures your receive from the harasser.  Give these to a parent, a principal or trusted adult." *Id*. at 12.

USD 259 also provides posters noting that "<u>this</u> is VIOLENCE too . . . bullying, insults, rumors, threats, sexual harassment and trash talk.  Preventing violence is everyone's responsibility." *Id*. at 17 (emphasis in original).

In 2001, USD 259 contracted with McGrath Systems, Inc. to provide training, and purchased the McGrath Sexual Harassment Training Course and Investigation manual for $13,500.  Mary Jo McGrath conducted sexual harassment training in the same year which

consisted of "two full days of a tremendous amount of information" for all district principals. *Id*. at 24.

Debbie McKenna was Supervisor of Safe and Drug Free Schools for defendant on December 8, 2005. She testified that beginning in 2001, she had the job responsibilities of what would be a Title IX Coordinator. On March 1, 2006, Ms. McKenna's title changed to "Title IX Director." She is regularly identified as a resource person for sexual harassment investigation or training issues.

USD 259 requires that principals and administrators receive annual sexual harassment training from Ms. McKenna and Human Resources using the "training of trainers model." Ms. McKenna and HR train the principals who then return and train their staff at their schools. *Id*. at 27. During the training, Ms. McKenna and her staff give an overview of Title VII, Title IX, and other applicable laws to staff and administrators. Additionally, the training provides a definition for sexual harassment, instructions on how to determine what constitutes unlawful harassment, and early warning signs that unobserved sexual harassment is occurring.

Students at South High School are instructed on the BOE sexual harassment policy by: (1) class assemblies on the first day of school where school officials explain the policy and ramifications for violating the policy; (2) discussions during the first week of school with teachers who explain the sexual harassment policy; (3) brochures that teachers distribute to students for discussion in small group settings of approximately twenty-five students; (4) pre-enrollment meetings, where guidance staff talk about harassment with all students in a small group setting; and (5) meetings with counselors throughout the school year when problems arise or as required by individual teachers.

*B.  Plaintiffs and Proposed Class Representatives:*

Proposed class representatives in the present case include sisters, Jane Doe 1 and Jane Doe 2.  Jane Doe 1 was born on November 7, 1987.  Jane Doe 2 was born on August 29, 1988.  Jane Doe 1 and Jane Doe 2 were scheduled to graduate from Northwest High School on May 25, 2006.  Jane Doe 1 and Jane Doe 2 lived in the Goddard School District during portions of their sophomore year, junior year, and senior year in high school.  Jane Doe 1 attended South High School during her freshman year (2002-2003), sophomore year (2003-2004), and six days into her junior year (2004-2005).  Jane Doe 2 attended South High School during her freshman year (2002-2003), sophomore year (2003-2004), and two or three days of her junior year (2004-2005).  Jane Doe 2 transferred to Northwest High School because: "it is the closest school to our house" and because she was "highly involved in DECA (a club for marketing students), and that is actually how I received my special transfer to Northwest is because of my experience in DECA and my awards won."  Doe 2 Deposition (Defendant's Exhibit 44), pg. 10.  Jane Doe 1 transferred to Northwest at her mother's behest.  Her mother was concerned that the faculty at South High School did not protect her and "wouldn't make sure that S.S. wouldn't be around her."  Doe 1 Deposition (Defendant's Exhibit 43), pg. 23.  In part, Jane Doe 1 did not transfer to Goddard High School because there was a student at Goddard High School who was a friend of S.S.  *Id*. at 18.

In a response to Defendant's Interrogatories, Jane Doe 1 claims that during the 2002-2003 school year, a student by the name of S.S. stated:

> I can't wait till I'm a junior and take you to the prom.  You'll loose [sic] your virginity to me; trust me, when the time comes you'll want

>   to; you should come over in your cheer uniform after the game and
>   I'll wear my football uniform and we can make a porno.

Jane Doe 1 and Jane Doe 2 Responses to Defendant's Interrogatory No. 4 (Defendant's Exhibits 38 and 39).

During Jane Doe 1's sophomore school year, plaintiffs also allege: (1) that S.S. grabbed Jane Doe 1's [buttocks] and said "Tight, just what I like"; (2) that S.S. walked down the hallway with his bare buttocks out and tried to hug [Jane Doe 1] and tried to get [Jane Doe 1] to touch his bare buttocks; (3) that S.S. snapped a cotton key chain across [Jane Doe 1's] face leaving a red mark on her face; (4) that S.S. would put [Jane Doe 1's] head under his arm in a headlock and run her into lockers; (5) that S.S. pushed [Jane Doe 1] by her chest up against the wall in a corner behind a door and said "I could, f . . . ing, rape and kill you and no one would care"; (6) that S.S. would attempt to lift Jane Doe 1's cheer skirt and she would hold it down and run away from him; (7) that S.S. was spreading rumors regarding Jane Doe 1 and her boyfriend at the time, by telling individuals that Jane Doe 1 lost her virginity to the boyfriend; (8) that Jane Doe 1 moved away from where S.S. was sitting at a basketball game because S.S. told her that he had condoms in his car and that after she left, S.S. sent a text-message to Jane Doe 1 which read "Let's go to my car, please." *Id*.

Jane Doe 2 makes the following claims concerning her sophomore year:  (1) S.S. consistently harassed her sister, Jane Doe 1, in the hallway or within the premisses of Wichita South High School; (2) S.S. would grab Jane Doe 1 during passing period between classes; (3) S.S. would grab Jane Doe 1's buttocks and make comments including that he liked her butt and that Jane Doe 1 was "his"; (4) S.S. would put his arms around Jane Doe 1 and tell everyone in

6

the hallway that Jane Doe 1 and S.S. were dating; (5) S.S. snapped his cotton lanyard in Jane Doe 1's face that left a red stripe across her face; (6) S.S. walked down a main hallway where administrators, counselors, and teachers are stationed at the end of the hallway with his buttocks hanging out of his pants; (7) Mrs. Sinclair, an administrator, and Coach Stovall witnessed S.S.'s indecent exposure; (8) S.S. put Jane Doe 1 in a headlock and ran her head into the lockers in the main hallway where witnesses, including administrators, were present; (9) S.S. made various comments to Jane Doe 2, including that Jane Doe 2, her boyfriend, and S.S. should have a threesome, or an orgy that included S.S. and Jane Doe 1; (10) S.S. placed condoms in Jane Doe 2's boyfriend's car; (11) S.S. exposed himself to plaintiff Jane Doe 2 during chemistry class by showing her his exposed penis in his hands and S.S. ordered Jane Doe 2 to touch it; (12) Jane Doe 2 and a witness to the chemistry class event informed the chemistry teacher, Ms. Owens, however, Ms. Owens stated she did not believe that S.S. would do such a thing, but that she would keep an eye on S.S. if it made Jane Doe 2 more comfortable; (13) S.S. would call another student, J.M., names like "Tiggo Bittie" which referred to the size of her breasts; (14) S.S. would also call the other student, J.M., "Boobley" rather than her name; (15) S.S. stated in the same chemistry class on a separate occasion: "Your boobs are getting bigger" to Jane Doe 2; (16) S.S. asked Jane Doe 2 if he could touch her breasts in the chemistry class for which Jane Doe 2 replied, "No, what are you thinking" and S.S. stated "At least I asked first"; (17) S.S. harassed Ms. Owens, the chemistry teacher, by calling her a "MILF" which stands for "mother I'd like to f . . ."; (18) S.S. would ask the chemistry teacher out to dinner or out on a date and said that the teacher was sexy; (19) Ms. Owens would only laugh and giggle about S.S.'s comments; (20) S.S. would tell Jane Doe 2 that another student was "hung like a horse." Jane Doe 2's Response to

Defendant's Interrogatory No. 4 (Defendant's Exhibit 39).  These events all occurred in the hallways of South High School.

Ms. Owens, the chemistry teacher at South High School, denies that Jane Doe 1 or Jane Doe 2 ever made a complaint of sexual harassment to her, despite the plaintiffs' allegations. Additionally, although Jane Doe 1 claims she made a complaint to Mr. Laudermilk, he denies that Jane Doe 1 or Jane Doe 2 ever made a complaint of sexual harassment, including any complaint related to S.S.

On Saturday, August 28, 2004, Jane Doe 1, Jane Doe 2, and their mother completed a report to police that contained allegations about S.S. from a private, back-to-school party off school grounds around midnight on a Friday night.  On Monday morning, August 30, 2004, Mother Doe signed a Protection From Stalking (hereinafter "PFS") Affidavit with the District Court of Sedgwick County naming S.S. as the perpetrator.  The affidavit stated:

> On 8/27/04 at around 12:00 S.S. was attending a gathering at a friend's house at which time he took his pants down and proceeded to 'hump' on my daughter [Jane Doe 1]. He held her down on a bed and kept trying to spread her legs.
>
> On 8/20/04 at or around 10:30 p.m. S.S. called my daughter's cell and said he had some friends over and they wanted to come over and "do a train" on [Jane Does 1 and 2].
>
> On 8/26/04 at or around 9:00 p.m. S.S. called my daughter's cell and told her "If she didn't have sex with him, he would just have to rape her.

PFS Affidavit signed by Mother Doe (Defendant's Exhibit 48).

After obtaining the PFS Affidavit on Monday morning, Mother Doe requested a meeting with a South High School administrator, Jennifer Sinclair.  Ms. Sinclair advised the Doe family

that, since the actions of the party occurred away from the school, the police were the proper party to whom to report the incident. Ms. Sinclair advised the Does that the school obtained a PFS order, but told the Does to document each incident of harassment in order to assist the judicial process. Additionally, she told the Does to report all incidents of alleged harassment to school personnel if they happened at school or at school activities. Ms. Sinclair advised that if incidents occurred off school property, the Does should alert the police.

Thereafter, when the sheriff's officers arrived at the school with the PFS order, S.S. was escorted by school security to the office and served with the order. A portion of the school security officer's report stated: "The initial incident occurred off of school property, but security and administration felt it necessary to stress to [S.S.] that he needed to keep his distance from the [Does], due to the fact that all involved are students at South High School." Officer's Report dated 9/1/04 (Defendant's Exhibit 49). Ms. Sinclair asked S.S. for his version of the facts from the Friday night party. She also warned S.S. to stay away from the Does, not to contact them via phone and to instruct his friends to leave them alone. Ms. Sinclair also met with S.S. on another occasion in the presence of the football coach to warn him to leave the Does alone and not to bother them.

Jane Doe 1 and Jane Doe 2 withdrew from South High School on September 3, 2004.

In support of certifying the class, plaintiffs submit examples of the defendant's failures which have caused sexual harassment to permeate throughout the district. In so stating, plaintiffs state that Mr. Marvin Latimer, a teacher, was investigated for improper conduct. Allegations ranged from impregnating a former student to making comments regarding "boobs" and "oral sex." Notes (Plaintiffs' Exhibit 8). Additionally, plaintiffs allege that various sexual incidents

occurred throughout the school district, which include allegations from a fourteen year-old female that a male student grabbed her breasts, allegations from a female kindergartner's mother that a male student sexually assaulted her daughter after seeing her daughter's zipper unzipped after school, and allegations from several ninth grade female students that a male student exposed himself in class.  Plaintiffs submit that in each case, except for one, defendant did not document discipline.  In some cases, plaintiffs further allege that a documented investigation did not occur, that parents were not called, and that help was not offered to the alleged victim.

## II.  *Standard of Review and Conclusions of Law:*

Plaintiffs note that "[t]his is the first class action case alleging a pattern and practice of deliberate indifference Title IX sexual harassment claim."  Memorandum in Support of Plaintiffs' Motion for Class Certification (Dkt. No. 63), pg. 39.  Defendant argues that plaintiffs' counsel does not cite any Title IX case in which the court has certified a class action for monetary damages because such claims on their face do not meet Rule 23 class certification requirements.  Defendant also notes that student-on-student sexual harassment did not state a cause of action for monetary damages under Title IX until *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629 (1999).

For plaintiffs to succeed on the motion for class certification, counsel must show "under a strict burden of proof, that all the requirements of [Fed.R.Civ.P.] 23(a) are clearly met."  *Rex v. Owens ex rel. State of Oklahoma,* 585 F.2d 432, 435 (10th Cir.1978); *see also General Tel. Co. of the Southwest v. Falcon,* 457 U.S. 147, 161 (1982) (class actions "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.").

Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et. seq.*, provides in part that: " . . . no person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

Under *Davis*, The Supreme Court outlined the circumstances under which a school district can be held liable for damages resulting from harassment: (1) actual notice or knowledge of the behavior; (2) acts with deliberate indifference; and (3) harassment is so "severe, pervasive and objectively offensive" that it effectively bars the victim's access to educational opportunities or resources. *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 642, 652 (1999).

Determining whether conduct rises to the level of actionable "harassment" "depends on a constellation of surrounding circumstances, expectations, and relationships." *Id.* at 651 (quoting *Oncale v. Sundowner Offshore Serv, Inc.*, 523 U.S. 75, 82 (1998)). Courts must bear in mind that schools are unlike the adult workplace and that children may regularly interact in a manner that would be unacceptable among adults. *Id*.

Plaintiffs also predicate their claims upon a violation of 42 U.S.C. § 1983. Specifically, plaintiffs argue, if a defendant acts with "deliberate indifference" to known acts of discrimination, the defendant can be liable for intentional discrimination under Title IX, citing *Bryant v. Indep. Sch. Dist. No. I-38 of Garvin County, OK*, 334 F.3d 928 (10th Cir. 2003).

*A. Rule 23(a) Requirements:*

*1. Numerosity:*

Plaintiffs note that there are currently over 20,000 female students in the district and, therefore, the requirement of numerosity is met. Plaintiffs also argue that over 300 complaints of sexual harassment were filed in USD 259.

"The burden is upon plaintiffs seeking to represent a class to establish that the class is so numerous as to make joinder impracticable." *Peterson v. Okla. City Housing Auth.*, 545 F.2d 1270, 1273 (10th Cir. 1976). The Tenth Circuit has stated that there is "no set formula to determine if the class is so numerous that it should be so certified." *Rex v. Owens ex rel. State of Okla.*, 585 F.2d 432, 436 (10th Cir. 1978).

Due to the sheer number of class members plaintiffs propose, assuming, at a minimum, 20,000 students, plaintiffs meet the numerosity requirement in that joinder is impracticable.

*2. Commonality:*

Plaintiffs argue that defendant has failed to properly investigate claims, failed to properly train individuals, failed to ensure that investigations are properly completed, and failed to maintain documentation necessary to keep female students safe.

In *General Tel. Co. of the Southwest v. Falcon,* 457 U.S. 147, 156 (1982), the Supreme Court held that members of a putative class must "possess the same interest and suffer the same injury." The Court denied class certification to a group of Mexican-Americans alleging Title VII claims because the group did not provide a "specific presentation identifying the questions of law or fact that were common." *Falcon*, 457 U.S. at 158. The Tenth Circuit recently upheld a district court's finding that plaintiffs presented "divergent fact patterns which ma[d]e this case

inappropriate for class action status." *Trevizo v. Adams*, 455 F.3d 1155, 1163 (10th Cir. 2006) (finding that the district court did not abuse its discretion in determining the essential element of commonality was not met where owners, employees, and customers of Latino-owned business sued city and city police officers under 42 U.S.C. § 1983, alleging that the manner in which search warrant was executed violated their civil rights).

Coupled together, the Court's holdings in both *Davis* and *Falcon* suggest that plaintiffs do not meet the standards for commonality and typicality. With Title IX claims, the Court has noted that each individual claim is specific. Due to the nature of Title IX, whether the conduct rises to the level of actionable harassment under Title IX depends on a host of circumstances, expectations, and relationships. *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 651-52 (1999). However, the Court stated in *Falcon* that members of a class must possess the same interest and suffer the same injury, while at the same time, present specific questions of common law or fact. *Falcon*, 457 U.S. at 156, 158.

In this case, the claims of Jane Doe 1 and Jane Doe 2 are factually different. Though the conduct alleged in Jane Doe 1 and Jane Doe 2's counts of harassment centers primarily on the conduct aimed at Jane Doe 1, the plaintiffs' claims differ based on the conduct allegedly aimed at each student. Moreover, plaintiffs' presentation of other harassment allegations took place in different settings, with different students and involving other relationships. These allegations, taken together, do not represent common issues of fact or law necessary for class certification.

Additionally, in a claim for Title IX, the Court has noted that each allegation needs to be weighed on an individualized basis. *Id*. The plaintiffs have not demonstrated that any of the defendant's specific policies have led to the alleged harassment. Despite plaintiffs' "pattern and

13

practice" characterization of their claims, plaintiffs do not identify a policy with any degree of specificity which commonly affects the class members as a whole.

Finally, plaintiffs submit that the class members should comprise "[a]ll females, formerly, currently or who in the future may be a student at any school within USD 259 since January 1, 1997." Memorandum in Support of Plaintiff's Motion for Class Certification (Dkt. No. 63), pg. 37. For certification, plaintiffs must submit evidence that suggests potential class members do in fact have actual or threatened injury and the desire to make a claim. *Reed v. Bowen*, 849 F.2d 1307, n. 3 (10th Cir. 1988). Plaintiffs' showing does not establish that members of the class have a continuing live interest in the action and desire to make a claim. Plaintiffs submit that there were approximately 300 complaints of sexual harassment filed in USD 259, but that fact does not establish that the proposed class members , some 20,000 students, have either an interest or the desire to make a claim. The court finds that plaintiffs fail to meet the commonality prong for class certification under Rule 23(a)(2).

*3. Typicality:*

Plaintiffs' counsel argues that the Doe students each suffered as a result of the pattern and practice of the defendant. Additionally, plaintiffs state that the claims proceed under the same legal theory: that defendant has acted with deliberate indifference in violation of Title IX and 42 U.S.C. § 1983.

Defendant correctly notes that the questions of commonality and typicality "tend to merge." *General Tel. Co. of the Southwest v. Falcon,* 457 U.S. 147 (1982). Defendant also argues that the claim of each proposed class member would differ from the plaintiffs' claims with respect to both liability and damages because of the vast factual differences in each individual

14

claim. A tension exists in the individualized nature of Title IX claims and Rule 23 commonality and typicality requirements. *See Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 651-52 (1999); *Falcon*, 457 U.S. at 156, 158. Due to this tension and that plaintiffs' proposed class presents different claims and factual differences, plaintiffs' claims do not satisfy the typicality requirement of Rule 23(a)(3). *See Stubbs v. McDonald's Corp.*, 224 F.R.D. 668, 675-67 (D. Kan. 2004) (typicality requirement in Title VII hostile work environment action was not satisfied because claims would involve different environments and conditions); *see also Davis*, 526 U.S. at 651 (determining whether conduct rises to the level of actionable "harassment" "depends on a constellation of surrounding circumstances, expectations, and relationships.").

*4. Adequacy of Representation:*

Under the final prong of Rule 23(a), plaintiffs must demonstrate that "the proposed representatives' interests are sufficient to induce vigorous advocacy on their part; that their interests are not antagonistic to those of class members; and that they have means, including competent counsel, to pursue their case." *Marcus v. Kan. Dep't of Revenue*, 206 F.R.D 509, 512 (D. Kan. 2002). "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Rutter & Wilbanks Corp. v. Shell Oil Co.,* 314 F.3d 1180, 1187-88 (10th Cir. 2002) (quoting *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1020 (9th Cir.1998)); *see also Amchem Prods., Inc. v. Windsor,* 521 U.S. 591 (1997) ("The adequacy heading also factors in competency and conflicts of class counsel.").

This court has no qualms concerning counsel's capabilities, but needs not address this issue further given the holding that plaintiffs fail to meet the commonality and typicality requirements for class certification.

*B.  Rule 23(b) Requirements:*

Plaintiffs also argue that they satisfy the requirements under Rule 23(b)(2) and (b)(3).  In addition to satisfying the requirements of (a), plaintiffs must show that (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. *Monreal v. Potter*, 367 F.3d 1224, 1235-36 (10th Cir. 2004).

Wholly apart from plaintiff's failure to meet the requirements of Rule 23(a), neither do plaintiffs meet the requirements of Rule 23(b)(2) or (b)(3).

Under Rule 23(b)(2), the plaintiffs must demonstrate that the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making final injunctive relief or corresponding declaratory relief with respect to the class as a whole appropriate.  Plaintiffs request injunctive and equitable relief under 23(b)(2) against defendant and its directors, officers, owners, agents, successors, employees and representatives, and any and all persons acting in concert with them, seeking to prevent them from engaging unlawful practices, policies, customs and usages, and requiring them to:  (1) conduct yearly mandatory training for all staff and administrators; (2) enforce all policies regarding sexual harassment; (3)

name an independent liaison who is not an administrator with USD 259 to handle all complaints of sexual harassment made by students; (4) require defendant to begin investigations into all sexual harassment complaints within twenty-four hours from initial complaint; (5) institute mandatory parental notification; (6) institute a requirement that places all teachers, staff and administrative personnel on notice of potential problems; and (7) institute procedures to effectively remove the alleged harasser from contact with the alleged victim until an investigation is complete. Plaintiffs' Complaint (Dkt. No. 1), pg. 13. Plaintiffs also seek monetary damages to compensate for the lost education benefits, other financial loss, humiliation, embarrassment, emotional and physical distress, and mental anguish, in addition to punitive damages.

Plaintiffs do not meet the requirements for Rule 23(b)(2) because the requested injunctive relief is vague and generalized, *i.e.*, to train staff and administrators, to enforce its policies, and to redraft policies. In *Monreal*, the Tenth Circuit upheld the district court's finding that plaintiffs did not articulate a policy other than generalized non-compliance with Title VII in the complaint. *Monreal v. Potter*, 367 F.3d 1224, 1236 (10th Cir. 2004) The *Monreal* court noted that Federal Rule of Civil Procedure 65(d) requires that injunctions be "specific in terms" and "describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained." *Id*.

Here, plaintiffs ask the court not only to enjoin defendant from engaging in unlawful practices, but to enforce all policies regarding sexual harassment. This generalized request is essentially a statement of policy which does not address the problem and cannot be fashioned in a manner which will satisfy the requirements of the federal rules. *See Keyes v. Sch. Dist. No. 1,*

*Denver, Colo.*, 895 F.2d 659, 668 & n. 5 (10th Cir. 1990) (striking injunction prohibiting defendants "from discriminating on the basis of race, color or ethnicity in the operation of the school system" and directing defendants "to use their expertise and resources to comply with the constitutional requirement of equal education opportunity for all who are entitled to the benefits of public education in Denver, Colorado.").

As an additional barrier to class certification, plaintiffs seek primarily monetary damages. The *Monreal* court upheld the district court's refusal to certify because plaintiffs sought primarily monetary damages. *Monreal*, 367 F.3d at 1236. Under the advisory committee's note to Rule 23(b)(2), the committee states that "[Subdivision (b)(2)] does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages."

Finally, plaintiffs do not meet the burden for class certification under Rule 23(b)(3). Class actions under Rule 23(b)(3) must have "questions of law or fact common to the members of the class [that] predominate over any questions affecting only individual members" and must be "superior to other available methods for the fair and efficient adjudication of the controversy." *Id*. at 1236-37.

Plaintiffs have not established common issues of fact. Additionally, although plaintiffs assert Title IX and 42 U.S.C. § 1983 as the common issue of law, plaintiffs' assertion of the alleged violations of Title IX among each of the class members varies widely. Therefore, plaintiffs have not met the burden of demonstrating that there are questions of law common to the members of the class that predominate over questions affecting only individual members.

Moreover, the analysis under Rule 23(3)(a)(2) demonstrates that at a minimum, plaintiffs do not meet the commonality requirement. In *Anchem Prods., Inc. v. Windsor*, 521 U.S. 591,

623-24, the Court described the predominance criterion of Rule 23(b)(3) as "far more demanding" than the Rule 23(a) commonality requirement.

For these reasons, the plaintiffs have not met the Rule 23(a) or Rule 23(b) requirements for class certification. Therefore, the court denies plaintiffs' motion for class certification.

IT IS ACCORDINGLY ORDERED this 26th day of February, 2007, that plaintiffs' motion for class certification (Dkt. No. 62) is denied.

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE